1

United States District Court

Oliver Lyons
v
A T Wall et al

Ca No 04 380T

Dear Mr. Chief Justice Torres

A pro se Plaintiff doesn't stand much of a chance on being successful but I believe your Court Justice Torres and the Defendants Legal Counsel are making sure I am denied any Due Process whatsoever.

Since I was moved from High Security because of my physical abuse the court has my medical records to document I have been denied all access to law books.

A Segregation inmate is locked in his cell 23 hours a day M-Fri and all day Sat Sun and holidays.

Chief Justice I enclosed my history of incarceration all of it and no violence Sir.

My only crime was reporting on an officer and his father for sexually abusing a Special needs child.

16

An inmate in Segregation does not have access to the Law Library and must depend on Law Clerks or Law Library officers but most of all a law cart that has criminal and Civil law books on it.
Law Library officers ignore all my requests for law books and now I'm told there isn't any law Cart in the building for Segregation inmates.
This is a clear Violation of an inmate 14th Amendment rights and the D.O.C. knows this.
Since November 2004 I have been denied law book and can't get one law book the Federal R of Civil P for four months.
I have been denied all reading material including library books.
I had gone into State Court to get library books and magazines in Segregation at High Security.
I have not had a hot shower for the months of Nov, Dec, Jan, Feb, and March.

Mr. Justice Hagopian signed a court Order on January 3, 2005 that ordered the Defendants Legal Counsel to respond to my "Request for Production".
They have ignored that order and the Court hasn't done anything.
I filed a motion for sanctions.
I'm doing all this without law books Your Honor.
I sent the Defendants Counsel another "Request For Production"
Your Honor in my Complaint 04 380 T I could only serve the Defendants listed under Parties because of my limitted access.
I had to limit the Defendants to 17 because of my situation but that is all that will be necessary to prove all my allegations of abuse.
I have been told for over four and a half months I will get fresh air and outside recreation now they tell me there isn't any outside rec yard. Thats another lie like the law Cart, library books, and

hot water.
I enclosed some documents showing you why I shouldn't have been arrested never mind in prison at High Security. Please respond Your Honor

Sincerely
Plaintiff Pro Se
March 19, 05 Oliver L Hyme
P.O. BOX 8249
Cranston, Rhode Island 02920

P.S. Justice Hagopian said "Absent exceptional circumstances the court can't appoint Counsel."
I believe I meet those standards.

United States District Court
For The District OF Rhode Island

Oliver Lyons
V
A T Wall et al

Ca No. 04 380T

Request For Production

Pursuant to the Fed R OF Civil P 34 the Plaintiff again asks that the Defendants produce the following documents, films, photo's X Rays MRI and all reports relating to the Plaintiff while incarcerated

The Court ordered the Defendants in an Order signed by Justice Hagopian on Jan 3, 05 to respond to the Plaintiff's Request For Production within 30 days.

A. The cuffing policy of an inmate at High Security on Segregation status while in the cell block, corridor, hospital or when an inmate is transported to an outside hospital.

B. The complete medical records of the Plaintiff in the custody of the D.O.C. where he was injured by the Defendants ~~or an inmate~~ and taken to outside hospitals or Emergency Centers or Intake hospital for treatment, all X Rays, reports, MRI's

C. All photo's of injuries sustained by the Plaintiff after allegedly being assaulted by officers at High Security

D. The policy on the extraction of an inmate at High Security and the operation of the camera from the start of the extraction from his cell, to the corridor, to see the nurse and to the cell behind the hospital to leaving for an outside hospital or Emergency Center

E. Any film of all extractions where the Plaintiff was physically removed from his cell.

F. The policy on the operation of the camera in the cell behind the hospital at High Security.

G. All film of the Plaintiff for all the time the Plaintiff was in the cell behind the hospital at High Security

H. The policy on the sealing of an inmates cell at High Security after he was allegedly assaulted by officers and injured.

I. The policy and what was done with the Plaintiffs bloody clothing after allegedly being assaulted by officers at High Security.

J. The pictures of the Plaintiffs cell where he allegedly was beaten and injured and where there was blood evidence.

K. The Disciplinary records of all the Defendants

L. Any photo's taken of blood evidence where the Plaintiff was allegedly assaulted in the corridor sustaining cuts that needed stitches and the rec yard where he was severely bleeding and also pictures of blood evidence where the Plaintiff was severely beaten in the rec yard and transported to Stat Care Emergency Center on 12 27 01

M. The medical records of any Defendant injured by the Plaintiff.

N. Any reports or investigations done by Inspector's Langlois, Lopez, Mallet or the State Police

O. Any photo's taken by Inspector's or the State police of any injuries allegedly sustained after being assaulted by officers and any photo's of bloody clothing, corridor's, cells, or recreation yard

P. Any photo's taken by Defendant Capt Headen of the Plaintiffs cell where he was allegedly assaulted with gallons of bleach by the Defendant and where the Plaintiff was removed and taken to the hospital and then put in another cell.

Q. What Defendant Capt Headen did with the bleach soaked clothing of the Plaintiffs clothing, blankets and sheets that she bagged and tagged as evidence.

R. Any written reports whatsoever written by Capt Headen relating to any alleged assault on the Plaintiff.

S. Any reports or records that would explain why the Plaintiff was moved to Med Security in 2002 and returned to High Security

T. Any reports or records or memo's that would explain why the Plaintiff was moved from High Security in 2003 and put in Medium Security and then returned to High Security

U. Any reports or records to explain why the Plaintiff was moved to Intake in 2004

V. The film at Medium Security where the Plaintiff was physically assaulted and verbally threaten by a State Marshal.

W. Any records or discipline taken on the three correctional officer who told LT Jankowski "that they didn't see anything or hear anything on August 14, 03 and that a Marshal didn't assault me and I self inflicted. The officer are caught on film watching in the doorway.

X. Any report or discipline taken on the nurse who treated me for a very large bruise on my head after I was assaulted by the Marshal.

The nurse stated in her notes dated 8 14 03 Inmate Lyons was assaulted by another inmate on his way to Court.

The Plaintiff asked this nurse why she lied she stated "That's what I was told to put done her name is Alice and she witnessed another assault.

Y. All tapes of the Disciplinary Board where the Plaintiff was found guilty of assault, attempted assault and escape.

Plaintiff Pro Se
Olwin L Lynn
P.O. Box 8249
Cranston, Rhode Island 02920

Certification

This will certify that on the 19th day of March 2005 I sent a hand written copy of "Request For Production" to the Defendants Legal Counsel 40 Howard Avenue Cranston, Rhode Island 02920 and to the United States District Court One Exchange Terrace, Providence Rhode Island 02903

Plaintiff Pro Se
Olwin L Lynn

ID: 091073
NAME: LYONS OLIVER S

SECURITY: INTAKE SERVICE CENTR
D.O.B: 01/01/1950

*** SENTENCE INFORMATION ***

| CASE NUMBER | CNT | IMPOSE | RETRO | STATUS | TERM YMD | GOOD |
|---|---|---|---|---|---|---|
| 31927331 | 01 | 04/19/1993 | 04/05/1993 | RELEASED ON CASE | 000 006 000 | 00/00/0000 |
| | | DESC: DRIVING WHILE INTOXICATED (DWI) | | | | |
| 61984576 | 01 | 10/20/1998 | 09/13/1998 | EXPIRATION SENTENCE | 000 003 000 | 12/13/1998 |
| | | DESC: RESISTING ARREST | | | | |
| 619815477 | 01 | 11/01/1999 | 08/16/1999 | EXPIRATION SENTENCE | 000 003 000 | 11/15/1999 |
| | | DESC: VIOL PROTECTIVE ORDER | | | | |
| P2982189A | 01 | 11/01/1999 | 10/11/1999 | EXPIRATION SENTENCE | 000 000 090 | 01/09/2000 |
| | | DESC: DELIVER CONTROLLED SUBSTANCE | | | | |
| P2000352A | 01 | 05/16/2000 | 04/15/2000 | CONTROLLING SENTENCE | 005 009 000 | 01/08/2006 |
| | | DESC: DELIVER CONTROLLED SUBSTANCE | | | | |
| PM030164 | 02 | 02/19/2003 | 08/19/2003 | EXPIRATION SENTENCE | 000 006 000 | 02/17/2004 |
| | | DESC: CIVIL CONTEMPT OF COURT | | | | |
| PM030164A | 01 | 02/19/2003 | 02/19/2003 | EXPIRATION SENTENCE | 000 006 000 | 08/19/2003 |
| | | DESC: CIVIL CONTEMPT OF COURT | | | | |

R.I. Dept. Of Corrections

**REQUEST FORM**

TO: LT Barney DATE: March 17, 05

I RESPECTFULLY REQUEST: (STATE PROBLEM - BE SPECIFIC) I would like to see the law Cart
I would like some library books
I have a right to be given what a High Security inmate receives
Why am I locked down for 6 days after being booked and not given a

INMATE NAME Oliver Lyons I.D.# 91073

WORK ASSIGNMENT: CELL NUMBER: L 11

H.S.C. MAXIMUM MEDIUM MINIMUM

WOMENS I.S.C. ✓ WORK RELEASE

shower after I see the board?
Why don't we have hot showers?
Why am I not given showers 5 days a week? Why don't I get outside Rec?

WING OR DETAIL OFFICER'S COMMENTS:

OFFICER'S SIGNATURE Lanbali

**Disposition of Case**

RESPONSE: No Law Cart in bldg. See State Corr off for lawbooks.
Deputy Caruso is considering allowing library books into Seg
5 days No Showers/Rec on each booking (nothing on weekends)
No outside recreation facility at ISC
Reduced hot water when laundry is running - maintenance has addressed this but the "fix" could take a long time.

SIGNATURE LtB TITLE DATE 3/18/05

NOTE: YOU WILL NOT BE CALLED IF IT IS POSSIBLE TO DISPOSE OF YOUR REQUEST PROPERLY WITHOUT AN INTERVIEW.

DISTRIBUTION:

| REQUEST | | RESPONSE | |
|---|---|---|---|
| WHITE | DESIGNEE | WHITE | INMATE |
| YELLOW | " | YELLOW | ASSOCIATE DIRECTOR |
| PINK | " | PINK | DESIGNEE |
| SALMON | INMATE | | |

S - 10

On October 11, 1999 I was arrested and charged with Poss l/w intent to deliver a controlled substance Xanax and Vicodin and delivery of Vicodin.
There wasn't any toxicologist report.
At a Violation hearing in Providence District Court Justice Indeglia Presiding I refused 15 days time served.
A subpoena was put out for a police informant named Ken Belmore and he didn't respond to the subpoena and threatened my Public Defender on his voice mail. This is on Court record.
When the police informant didn't show up for Court Justice Indeglia stated "I don't need Belmore I'm violating him and giving him 90 days to serve."
Justice Indeglia then put out a Warrant for Ken Belmore.
The next day in Providence Superior C[illegible] I told Justice Clifton what had taken place in District Court.
Justice ask the Prosecutor if what I said happened and the Prosecutor said yes
Justice Clifton then gave me 90 days concurrent but refused to let me

plead Nolo and take 5 years 9 months probation on the charges.
I told my Public Defender I wanted to go to Trial on the charges.
Justice Indeglia then took 72 days off my 90 day sentence because I was held 5 consecutive times without bail on false charges and found not guilty at Violation hearings!
My Public Defender Megan Clingham refused to have me brought before Justice Clifton to have the 72 days taken off my 90 day concurrent sentence.
After my 90 day sentence was up on Jan 9, 2000 I was moved from Medium Security to Intake.
For five weeks the Public Defenders Office refused to ask for bail on my charges and passed on my Pre-arraignment on Jan 4, 2000
When I was brought to Court on Feb 16, 2000 Public Defender Christine O'Connell said take 5 years 9 months probation or go back to prison-
I said I'm innocent

and I didn't sell any of my pills
Christine O'Connell told me they
can still find you guilty of Poss
w/intent of Xanax and Vicodin.
I found out this is not true
because I had perscriptions written
by a Doctor Levy and perscriptions
from State Line Pharmacy in Pawtucket.
I ended up taking 5 years 9 months
probation for Poss/w intent of
Xanax and Vicodin and delivery of
Vicodin.
This probation was then violated
on perjured testimony outright
lies.
On May 16, 2000 I was violated
by Justice Indeglia who stated
"I believe everything Dorothy
Connelly tells me"

"I believe Oliver Lyons is capable
of causing serious harm to people
but I don't know why?"

"Oliver Lyons is beyond rehabilitation although he's done very little jail time throughout his life"

The testimony of Dorothy Connelly at my trial is attached and shows that her testimony at my Violation hearing was all perjury and outright lies.

I also attached her medical records. Justice Indeglia refused to read the transcript of Dorothy Connelly's testimony at my trial.

Incredibly I have been incarcerated for 5 years because I refused to plead guilty to a crime of felony assault because its obvious to anyone who reads her testimony and looks at the medical records I never put a finger on this lady.

I also attached my records of my perscription showing the Pawtucket Police charged me with Poss / w intent of Xanax and Vicodin and this was wrong

Oliver S Lyons

1

Feb 19, 05

Oliver S. Lyons 5 years 9 months to serve on fabricated and perjured testimony!
We can agree there are different standards at a Violation hearing and a trial.
At a Violation hearing the standard is reasonably satisfied and at a trial beyond a reasonable doubt.
Then please explain why when a person has a high paid private Attorney and goes to trial on the charge's first that are the basis for his Violation and is found not guilty the Violation is withdrawn.
How would you present him as a Violator?
You don't and why not?
I went to a Violation hearing first and then was found not guilty of the charge's that was the basis of my Violation one year later at trial
Why did the Violation stick?
It seems there is not different standards but a double standard.
If I pleaded guilty and had taken the deal I would have gone home four years ago.
Should I have pleaded guilty knowing I was innocent?

I would not take this lady to Florida with me and she said if I didn't she would Violate my probation and I laugh at her. She broke a window and called the Pawtucket Police to charge me with a B+E.

I was living with her and paid the rent and had my name on the rent receipt and told the police to check the blood type on the window and then showed the police keys to the front door.

She wasn't working and lied at the Violation hearing.

The police said you are free to go and I said thats nice Thank you!

When I was leaving this lady said I am still going to Violate you if you don't take me to Florida with you.

I enclosed the last page of her testimony at my trial.

The transcript of her testimony belongs on the Tonight Show

Sincerely

[illegible signature]

injuries you sustained on April 8th, 2000, and tell us which one is a picture of the front of your neck?
A Don't have one, sir. I said possibly from the turtleneck.
Q So, the police officer - when you instructed him and told him where your injuries were, he did not take a picture of the front of your neck, isn't that true?
A That's right. Obviously not.
Q These are the only pictures of you?
A Obviously not.
Q Even though you told him you were squeezed from the front of the neck?
A I told him I was chocked five times.
Q All right. You also have a photograph, which is 6 full, and that's under the left arm, correct?
A Yes, it was.
Q And we also have No. 2 full, which is the right shoulder area, correct?
A Yes, sir.
Q And these are injuries that you sustained on April 8, 2000 when Mr. Lyons was getting physical with you, isn't that true?
A Yes, sir, yes, it was from that.
Q Did you ever have any bruises on your arm before that particular occasion?

A No, I didn't.
Q Okay. Did you ever complain about your arm before that particular occasion?
A No, I didn't.
MR. SMITH: May I have a moment.
THE COURT: Yes, you may.
(Pause)
Q Back in April of 2000, what was are phone number?
A I don't remember what my phone number was.
Q Are you familiar with a number 725-9002?
A No.
Q You're not?
A No, I'm not.
Q Are you familiar with a doctor by the name of Weir, W-E-I-R?
A Yes, I am.
Q Was he a treating physician of yours back in April of 2000?
A She still is.
Q Okay. Is your date of birth 8/29/62?
A Yes, sir.
Q Did you call on April 4, 2000 the Memorial Hospital of Pawtucket and complain that you hit your arm, very sore, and would like to see the doctor?
A Not that I remember.

MR. SMITH: May I approach the witness.
THE COURT: Yes, you may.
Q I'm going to show you Page 2 of Exhibit B and ask you is that your name that is listed there where it says patient's name?
A Dorothy Connelly.
Q Your date of birth that's listed there?
A Yes, it is.
Q Do you remember making a call to anybody at the Pawtucket Memorial Hospital on April 4, 2000 complaining about you hit your arm, very sore, would like to see or talk to someone?
A I don't remember, but, obviously, I did.
Q So, when you told this jury that prior to April 8th of 2000 there was nothing wrong with your arm, does this refresh your recollection that you did make a complaint about your arm?
A Not really, but, obviously, I did.
Q Okay. So, can you tell the jury whether or not the exhibits that you introduced and said was the injury you sustained on April 8, 2000, was that the same injury you were complaining about on April 4, 2000 when you called the hospital?
A You know why this isn't --
THE COURT: Just a moment.

THE WITNESS: Yes.

THE COURT: Can you answer the question, please?

THE WITNESS: This is the one that's done on the 8th.

THE COURT: Could you read that back, please.

(Answer Read)

Q Tell us about the one that was done on the 4th, if you remember?

A Like I said, I don't remember it.

Q Now, before the 8th, did you ever make a complaint to the hospital that your ex-husband was bothering you and threatening you?

MS. LEYDEN: I object.

THE COURT: Basis.

MS. LEYDEN: It's not relevant to these proceedings, your Honor.

THE COURT: Could I see counsel at Side Bar, please.

(Side Bar Conference)

THE COURT: Why do you say this is not relevant?

MS. LEYDEN: Prior abuse by the ex-husband?

THE COURT: What is the time frame of any claim of prior abuse?

MR. SMITH: She told the people at the Hospital on April 7th of 2000 that she was anxious. She had

panic attacks. She was scared of all sounds. That her ex-husband is now threatening her and her new partner, and she's receiving support from her new partner. This is the day before the incident. One of the reasons why I want to get into this, Judge, is she's given the impression that she was unable at any time to notify the police. I would like to show she notified the police with respect to her ex-husband. So, she knows how to call and complain about abuse.

THE COURT: How do you know that?

MR. SMITH: It's in the medical records.

THE COURT: That she notified the police?

MR. SMITH: Yes, sir.

THE COURT: Where is that contained in the medical records?

MR. SMITH: If I may have a moment.

THE COURT: Yes.

(Pause)

MR. SMITH: Page 22.

THE COURT: Page what?

MR. SMITH: 22. Very anxious, scaring physically - scaring, very anxious, scaring, history of physical abuse. Less than a year ago took 100 percent of dye, vomited in bathroom, complaining of burning pain, et cetera, et cetera. Mom and boyfriend very

supportive. And I want to get into the fact that this person, I don't know exactly where it is now, where it is. Maybe in her answers in the violation hearing that may be where I'm thinking of. But I know somewhere she said that she had called the police on her boyfriend. And I think the indication is that she's scared. She's unaware, she doesn't know what she can do. If she has a prior history where she knows she can call the police, the jury is entitled to know that.

Although she said she is highly medicated during the course of the hospital stay, it's not reflected in the medical records. It says she is giving information to them during the April 10 and April 11. She says she is sleeping and dopey. The records say she can't sleep and she is oriented, and she knows what is going on.

THE COURT: Let's stick to the issue here as to whether or not she has ever been the victim of any prior abuse by her husband.

MR. SMITH: Well, in --

THE COURT: The area that you point to, the medical records at Page 22.

MR. SMITH: Page 22.

THE COURT: The date of that was 4/10. Based on

her testimony, that was while she was in the hospital. I'm looking for - I'm looking for direct evidence, nothing collateral, that states that she was a victim of prior abuse.

MR. SMITH: If I may have a moment.

THE COURT: Yes.

MR. SMITH: Judge, it's the transcript, Page 38, specifically Line 17.

THE COURT: What do you have to say about that, Ms. Leyden?

MS. LEYDEN: Your Honor, this abuse took place eight months prior to this incident. This abuse happened in another state. She testified that she did not testify to that. I don't know what Mr. Smith is alleging she's saying that she didn't know how to call the police. That's not what she stated on direct examination. She couldn't, not that she didn't know how. It's not relevant. If the defense is alleging that this abuse occurred from someone else, I agree it would be relevant. But it's not relevant to these proceedings.

THE COURT: Mr. Smith, in reading the transcript, it does appear that from the review of the transcript on Page 38 Line 9, Ms. Connelly answered: When I came out here, which suggests that that happened in

some other place.

MR. SMITH: Judge, there is no question about it. That was merely a foundation question because the impression here is she didn't know about going to the police. She had to wait until she saw her sister. That's the inference they argue. And the fact is this lady knew she could call the police at the hospital, and I think I can get into that area, at least to show she knew the mechanics about it. That is all I'm interested in. I'm not trying another case.

THE COURT: I don't know the circumstances under which - where she was and the circumstances under which it was permissible there. And I think we're getting a little bit - I will permit you to cross-examine her about what happened at the hospital, if anything prevented her from calling at that location. But what occurred earlier in another geographic location, I'll sustain the objection.

MR. SMITH: That's fine.

(End of Side Bar Conference)

Q You knew after this incident, when you say Mr. Lyons did these things to you, that if you could get to a phone, you could call the police and notify them of this assault, isn't that true?

A Did I know it?
Q Yeah.
A Yeah, if I was able to deal with it, yeah.
Q Well, by deal with it, what I'm suggesting is if Mr. Lyons wasn't around, if he had left the house after you say he did this, you knew you could have called the police and reported him, isn't that true?
A Yeah, if I wasn't sleeping or something, sure.
Q And so you're telling us that that is - this injury, that the only reason why you didn't report this to the police until April 12th of 2000 was because you didn't have access to a phone, isn't that true?
A Either that or I was, you know, sleeping or, you know, whatever, yeah.
Q And you also indicated to us that while you were at the hospital you were under such medication that you were unable to really coherently use the telephone, is that true?
A I don't remember using it.
Q Well, there was a phone there, wasn't there?
A Yes, there was.
Q Did you tell us that you called your mother at sometime, isn't that right?
A Right before I left the hospital.
Q Right. So when you used the phone right before you

left the hospital, how long a period of time did you think you were able to pick up the phone and talk to someone?

A I don't - I could have maybe 15 minutes, 10 or 15. I don't know when he was coming. He was on his way when I talked to my Mom and I was still drugged up.

Q When you say drugged up, could you explain to us what you mean by that, as far as your ability to remember what happened on April 8th and report it to the police?

A Yes. By what I mean is I don't do any drugs, so any medication which they had me on, which morphine is very strong, it really knocked me out. Vicodin is really strong, it really knocks me out. So that's what I consider to be drugged up. It wasn't a Tylenol or aspirin, it was serious narcotics.

Q So, you're telling us that your memory is while you were in the hospital, you weren't able to communicate with the hospital staff too?

A Yeah, pretty much. I was pretty drugged up.

Q So, if there are any reports in the hospital records indicating that you were able to communicate and you did tell them certain things, specifically, about your condition, then they are wrong?

A I might not even remember saying anything, that is

what I'm saying.
Q Well, do you remember - I'm sorry. You remember going initially to the hospital, isn't that right?
A Yes, sir.
Q Okay. Now, on April 7, three days after April 4, did you again contact the hospital and ask for permission to go to the Emergency Room?
A You show me the paper stating that I called, that is all - that is all I know about it.
Q I'm going to show you Page 3 of Exhibit B, you see this entry 4/7/2000?
A Uh-huh.
Q Would you read that to yourself please?
A (Witness Complies) Yes.
Q Do you remember going to the hospital and asking for medication on 4/7/2000?
A Vicodin, I don't think so.
Q Okay.
A I don't remember that.
MR. SMITH: Judge, may we approach just the bench, please.
THE COURT: Yes. Ms. Leyden.
(Attorneys approached the Bench without the Reporter)
MR. SMITH: May I continue, your Honor?
THE COURT: Yes, you may.

Q And that was the next day you contacted the hospital again?
A (Nodding Yes)
Q That was in the morning?
THE COURT: That's a question. Did you contact Memorial Hospital on April 8, 2000 in the morning?
THE WITNESS: I guess I did. Obviously, I did.
Q And then you did go to the Emergency Room on April 10, 2000, you've told us about that, isn't that true?
A April 10.
Q The 10th, that's the day you went in for this operation, do you remember?
A Yeah.
Q When you get to the hospital in the Emergency Room, do you have to visit a nurse so that she takes some information from you?
A I guess so, yeah. I would imagine you do, yeah.
Q And when you visited that nurse, you told us that you gave them what they call a medical history that you fell down because you're telling us Mr. Lyons told you to say that, correct?
A Yes.
Q Did he tell you to say anything else other than you fell down?
A Not that I can remember.

Q On April 7th, did you not ask to go to the Emergency Room for medication because you couldn't sleep and you were the victim of domestic violence?

MS. LEYDEN: I object.

THE COURT: Overruled.

Q Did you say that on April 7th?

A I don't remember.

Q Okay. You are not disputing that is what it says here?

A No, that is what it says.

Q And if my memory is right, April 7th, that's the day before this incident?

A Yes, sir.

Q And Oliver Lyons, you've told us already, he never did anything to you before April 8th of 2000, isn't that right?

A No, he didn't.

Q Okay. And would you agree with me that you contacted the hospital the next day on April 8th also in the morning?

A If I did, I did.

Q Okay. Page 10 of Exhibit B.

A Yeah, I can see that.

Q Is that 4/8/2000?

A Yes.

Q Okay. When would that fall have been? That would have been the fall on Saturday when this occurred?
A Yeah.
Q Okay. So that would have been a fall on April 8, 2000?
A No, I would have fell on Saturday because April 8th was when he did it.
Q That's Saturday, April 8th?
A Saturday, yeah.
Q I don't mean to confuse you?
A Thank you.
Q We are on the same date, April 8th, Saturday?
A Yeah.
Q So, when you went - when you had the problem with your breast and you went in for that surgery, you told us that Mr. Lyons indicated to you that you would tell them that you fell, and that's on Saturday, and that's what caused those injuries, correct?
A Yes, sir.
Q And that was Saturday, not Friday, isn't that true?
A Yes, sir.
MR. SMITH: Okay. Page 13.
Q I have a report here from the hospital, it's dated 4/10/2000 and it talks about chief complaint: A lump to the right breast, with redness around the nipple,

with red strings going up under the arm. You had those problems, didn't you, that day?
A On the 10th.
Q When you went there?
A That is why I went there.
Q Okay. Patient also complains of left shoulder pain. The patient sought *saw* family care on Friday for shoulder pain. States she reinjured shoulder Friday night. Did I read that correctly?
A Can you read it again for me.
*saw See medical record*
Q Sure. Patient sought family care on Friday for shoulder pain. States she reinjured shoulder Friday night. Did I read that correctly?
A Yes, it must have been.
Q So, the photographs that depict your shoulder that you're telling us that was caused by Mr. Lyons, was that the shoulder that you injured on that Friday night that you told the hospital personnel about on April 10?
A This one?
Q Yes, Ma'am.
A All the bruises was there when they took the pictures at the police station, okay. The one that was on my arm, I know for sure because that is the position of my couch when he chocked me. My arm was here. My

neck here. My other arm up here. I was in the corner so --
Q These photographs don't show the injury you complained of on Friday night of April 2000?
A Not that I know of. Those were all taken from the police station.
Q I understand they were taken from the police station, but the injury occurred on April 8th and the photographs weren't taken until April 12th?
A Huh.
Q Are you telling me that the injury you sustained that you told the hospital happened on Friday April 7th, that vanished, so it's not in these photographs?
A I don't remember even telling them going to the hospital, okay.
Q But you are not denying that is what the records say, right?
A No, I'm not denying that.
Q Okay. Now, and I apologize. I just want to make it perfectly clear. It was an abscess that you had on your breast that the surgery was performed, isn't that true?
A I just know it was an infection of some sort.
Q And you are not saying that Mr. Lyons caused that infection, are you?

A I never said that.
Q I know. I just want to make it perfectly clear that's not your claim, is it?
A No, sir.
Q Because you've got that, you had some suntanning problems prior to this, you were going to suntanning?
A What?
THE COURT: Mr. Smith, she's indicated that she is not --
MR. SMITH: I understand.
THE COURT: There is no suggestion that Mr. Lyons caused this.
MR. SMITH: That's fine. I'll move on.
Q Well --
THE COURT: By this, I'm referring to the problem that she had with her right breast.
MR. SMITH: Yes, sir.
Q Now, you told us that while you were at the hospital you were heavily medicated, isn't that true?
A Yes, sir.
Q And so your recollection is, your ability to communicate with the hospital staff was limited at best, isn't that right?
A That's how I felt.
Q Okay. Did you ever tell anybody at the hospital staff

on or about April 10, 2000 at approximately 11:30 P.M. that your mother and boyfriend were very supportive?
A I don't even remember.
MR. SMITH: May I approach.
THE COURT: Yes, you may.
MR. SMITH: Page 22.
Q I'm going to show you, this is Page 22 of the medical record, and I'm just going to read this line. Mom and boyfriend very supportive, did I read that correctly?
A Yeah, you did.
Q So, does that refresh your recollection that you were able at least to communicate to some of the people at the hospital on April 10th at 11:30 P.M. that your boyfriend, and I assume that was Mr. Lyons at the time, was supportive?
A That indicates I was heavily medicated.
Q Okay. Because you would have said that he beat me and we should lock him up, isn't that right?
A I don't know what I would have said, sir.
Q You told us that you were medicated and, therefore, you were groggy while you were staying at the hospital, correct?
A Yes, sir.

A I didn't know that they were - who they were going on to arrest. I can't say they wasn't. If they found him to be guilty of breaking in, they probably would have arrested him.

MR. SMITH: Page 54.

MS. LEYDEN: Of what?

MR. SMITH: Of the prior testimony. Page 54, your Honor, it's Line 7. May I approach the witness.

THE COURT: Yes, you may.

Q We have already established that you had given testimony in this Court House on an earlier occasion about this, correct?

A Yeah.

Q Okay. I'm going to show you Page 54 Line 7 and I'm going to read this question: And it was after he chose not to arrest Oliver for breaking and entering that's when you decided to tell the officer that Oliver assaulted you two days before, correct? And your answer was: Yeah. Did I read it correctly?

A That is right.

MR. SMITH: That is all I have, your Honor. Thank you.

THE COURT: Redirect examination.

MS. LEYDEN: Thank you, your Honor.

FANTU... Y, DOROTHY 04/21/00
08/29/62 ST
0377 WEIR, RI 028..
023
FCA

Message Form Marsh Smith Rec'd Schart

Date 4/6/00 Time 1:40 Rec'd By DA

Pt Name Dorothy Connelly Age 8/29/62

☐ Homebound ☐ Nursing Home ☐ Routine

Return Call: ☐ STAT ☐ Routine (within 2 hours)

☐ When available ☐ Return call not necessary

Patient's Tel # 725-9002

Caller Pt Tel #

Pharmacy Tel #

Doctor Weir Chart # 0410

Insurance

Pt Complaint/Request--Secretary

Please call Pt. she needs to speak to you. Having a lot of trouble. Mess > DSM to call pt

7791-106 (Rev. 11/21/96)

History Time Call Returned:

Needs to go to CCC or the memorial hospital ER or Butler ER, Please have resident call, Recieved (schart M Smith 4/11/00 suicidal

Assessment/Plan 3 1/2 pm Appr @ 2 15 4/7

Has appt 4/7/00 2 15 ... going to Florida-H/0 physical abuse ... Pt Safe Now

Signature: K. E. Chapman

Disposition: ...

☐ ER (Auth# ☐ Needs f/u call

☐ MD appt. w/in 24 hrs ☐ MD f/u ☐ MD call ☐ No f/u

SEP 06 2000

BP:____ T:____ P:____

WT:____ LMP:____ Exercise:____

Allergies:____

Refills:____

Smoking History:____

NO SHOW

( ) CALL IF YOU ...

( ) ...

( ) ...

CONNELLY, DOROTHY
92 BATES ST
PAWTUCKET R 02
09/29/62 WEIR, LORI
037Y

Dr's Box

## Message Form

Date 4-4-00 Time 2:30 Rec'd By
Pt Name Dorothy Connelly Age
9-6-2
Homebound / Nursing Home / Routine
Return Call: STAT / Routine (within 2 hours) / When available / Return call not necessary
Patient's Tel # 725-9002
Caller Tel #
Pharmacy Tel #
Doctor Weir Chart # 2110
Insurance
Pt Complaint/Request--Secretary

Hit Arm - real Sore - Would like to see you + Talk to you

History Time Call Returned:

4-4-00 1p No answer
4-4-00 5p Busy

Assessment/Plan

Please Call

Signature:

Disposition:
ER (Auth# ) Needs f/u call
MD appt. w/in 24 hrs MD f/u MD call No f/u

7791-106 (Rev. 11/21/96)

MEMORIAL HOSPITAL OF RHODE ISLAND EMERGENCY DEPARTMENT RECORD

PAGE 1

Connell 8/29/62

| DATE | TRIAGE TIME | LOCATION | MODE OF ARRIVAL (CIRCLE) WALK W/C STRETCHER CARRIED POLICE AMB/RESCUE |
|---|---|---|---|
| 4/1/03 | 10:16 | WR | WALK (circled) |

TRIAGE CATEGORY 1 2 3 (3 circled)

CHIEF COMPLAINT: lump to (L) breast ō

HX PRESENT ILLNESS / INJURY: around nipple & red streak going up (L) arm. (L) elbow to (L) shoulder pain. Pt saw Family care on Friday for shoulder pain. States she injured shoulder Friday night.

HAVE YOU EVER FELT THREATENED BY YOUR SIGNIFICANT OTHER / CAREGIVER? ☐ YES ☐ NO

PERTINENT PAST MEDICAL / SURGICAL HISTORY: Anxiety

| MEDICATION | DOSE / FREQ | LAST DOSE | MEDICATION | DOSE / FREQ | LAST DOSE | MEDICATION | DOSE / FREQ | LAST DOSE |
|---|---|---|---|---|---|---|---|---|
| None | | | | | | | | |

Tetanus

PCP / PMD: FCC (Lopez)

ALLERGIES / REACTIONS: NKDA

PRE HOSPITAL CARE ☐ N/A ☐ See EMS Treatment Form

LAST TETANUS

IMMUNIZATION STATUS (<5 YR) ☐ CURRENT ☐ NOT CURRENT ☐ UNKNOWN

| BP | TEMP | PULSE | RESP | WEIGHT | LMP | TRIAGE SIGNATURE / TITLE |
|---|---|---|---|---|---|---|
| 124/86 ☒ L | 99 ☒ O | 117 | 20 | ☐ LB ☐ KG | present | [signature] |

## PATIENT ASSESSMENT

**GLASGOW COMA SCALE ADULT (PEDI <2 Yrs.)**

Eye Opening
- ☒ 4 Spontaneous
- ☒ 3 to Voice
- ☐ 2 to Pain
- ☐ 1 None

Verbal
- ☒ 5 Oriented (Coos, Babbles)
- ☐ 4 Confused (Irritable Cry)
- ☐ 3 Inapprop. (Cries to Pain)
- ☐ 2 Incomp. (Moans to Pain)
- ☐ 1 None

Motor
- ☒ 6 Obeys (Normal spon. move)
- ☐ 5 Loc. Pain (Withdraws to touch)
- ☐ 4 Withdraws (to Pain)
- ☐ 3 Flexion
- ☐ 2 Extension
- ☐ 1 None

Total 15

**PRIMARY INTERVENTIONS** (Field / Triage)
- ☐ Wound Cleansed
- ☐ Dressing
- ☐ Bleeding Control
- ☐ Splint
- ☐ Ice
- ☐ Elevation
- ☐ C Spine Precaution

VISUAL ACUITY / CORRECTION: OD OS OU ☐ YES ☐ NO

**HEAD / NECK** ☐ N/A
- ☐ +LOC Duration
- ☐ Runny Nose
- ☐ Sore Throat
- ☐ Earache R ___ L ___
- ☐ Other

Lt ___ mm Rt ___ mm — ☐ Reactive ☐ Non Reactive ☐ Sluggish ☐ C-Spine cleared by ___ X-ray / Exam

2mm 3mm 4mm 5mm 6mm 7mm 8mm

**BEHAVIOR**
- ☒ Cooperative
- ☐ Uncooperative
- ☐ Combative
- ☐ Unresponsive
- ☐ Age Appropriate

**CHEST** ☐ N/A ☐ See Care Map
- ☐ Smoker ppd ___
- ☐ Symmetrical
- ☐ Asymmetrical
- ☐ SC Emphysema
- ☐ Cough
- ☐ Sputum
- ☐ Color
- ☐ Hemoptysis

Respirations: ☐ Unlabored ☐ Labored ☐ Shallow ☐ Deep ☐ Retractions ☐ Nasal Flaring ☐ Accessory Muscle

Lung Sounds: ☐ Other; Lt. / Rt.: Clear, Wheezes, Rales, Rhonchi, Diminished, Absent

Chest Pain: Onset, Location, Type, Duration, Radiation, ☐ Pain Scale, ☐ Palpitations, ☐ SOB, ☐ Diaphoresis, ☐ Nausea, ☐ Dizziness

**PSYCHO SOCIAL**

Support Systems: ☐ Lives Alone ☐ SNF/NH ☒ Family/SO ☐

Barriers to Communication: ☐ Sight ☐ Hearing ☐ Language; Cultural/Religious Factors; Substance Abuse

**ABDOMEN** ☐ N/A — Pain ☐ N/A; GU ☐ N/A; OB/GYN ☐ N/A
- ☐ Soft ☐ Distended ☐ Rigid
- ☐ Nausea ☐ Vomiting ☐ Diarrhea x ___/24°
- Bowel Sounds: ☐ Present ☐ Absent ☐ Hypoactive ☐ Hyperactive
- ☐ Constipation ☐ Incontinent ☐ Bowels ☐ Bladder
- Last BM
- ☐ Epigastric ☐ LUQ ☐ RUQ ☐ LLQ ☐ RLQ ☐ L Flank ☐ R Flank ☐ Suprapubic ☐ Periumbilical ☐ Alcohol quantity
- ☐ Urgency ☐ Frequency ☐ Hematuria ☐ Catheter Present ☐ Ostomy ☐ Burning ☐ Other
- G ___ P ___ AB ___ ☐ Vag Discharge ☐ Vag Bleeding; Pads / ___ / hr.; Tampons / ___ / hr.; EDC; FHT; Last drink

**SKIN**
- ☒ Warm ☐ Hot ☐ Cool ☐ Cold ☐ Dry ☐ Moist ☐ Diaphoretic ☐ Cyanotic ☐ Lesions
- ☒ Pink ☐ Dusky ☐ Ashen ☐ Jaundiced ☐ Mottled ☐ Flushed ☐ Pale ☐ Normal for Skin Color

**SKIN INTEGRITY** ☐ INTACT ☐ N/A
- ☐ Abrasion ☐ Avulsion ☐ Laceration ☐ Pressure Ulcer ☐ Swelling ☐ Bruising ☐ Other

Front Back



**EXTREMITIES** ☐ N/A

| | PULSES Y N | EDEMA Y N | SENSATION Y N | MOTION Y N | CAP REFILL (<2 SEC) Y N |
|---|---|---|---|---|---|
| Upper Ext Right | ☑ ☐ | ☐ ☑ | ☑ ☐ | ☑ ☐ | ☑ ☐ |
| Left | ☑ ☐ | ☐ ☑ | ☑ ☐ | ☑ ☐ | ☑ ☐ |
| Lower Ext Right | ☑ ☐ | ☐ ☑ | ☑ ☐ | ☑ ☐ | ☑ ☐ |
| Left | ☑ ☐ | ☐ ☑ | ☑ ☐ | ☑ ☐ | ☑ ☐ |

**SAFETY** ☒ N/A
- ☐ History of Falls ☐ Side Rails Up ☐ Family Present ☐ Restraints (See order)
- ☐ Inability to follow instructions

SIGNATURE/TITLE [signature] TIME 11:35 LOCATION / ROOM 11:35 T4

MEMORIAL HOSPITAL OF RHODE ISLAND
PAWTUCKET, RHODE ISLAND
PROGRESS NOTES

WEIR, DOROTHY FCA
92 BATES ST
PAWTUCKET RI 02861
08/23/62 WEIR, LORI
037Y

| DATE/TIME | |
|---|---|
| 4/7/00 | Medical Student Maria Corgueiro |
| | cc: anxiety, sleeplessness, depression |
| | HPI: Being anxious, worry and with accentuating symptoms of panic attacks the last two mo. |
| | Not being able to sleep or to eat normally the last week. Gets scared of all sounds. |
| | Separate for 5 mo ago from abusing husband. He's now threatening her and her new partner. |
| | She's now being in contact with her family who, as well as the new partner, support her to get counseling and medication for her condition. |
| | PMI: depression, anxiety, being admitted for 6 yrs ago, under a distressful situation, then treated c Benzodiazepines & counseling. |
| | Allergy: NKDA |
| | Social Hx: Divorced. 1 8 yo boy who lives at a Hotel |
| | Tob: 1/2 pack/day ETOH — IVDU — |
| | Meds: non. |
| | PE: Gen: in distress, talking fast, switching [illegible] |
| | VS: BP 135/70 P 90 RR 18. |
| | HEENT PERRL EOMI TM V.B. [illegible] |
| | Neck: no nodes. scar from P.F. |
| | lungs: CTAB ø r/r/w |
| | CV: RRR, HR 90, ø m/g/r |
| | Abd: S NTND ⊕ BS, light discomfort in epigastric |

7741—200 (Rev. 10/95)

MEMORIAL HOSPITAL OF RHODE ISLAND
PAWTUCKET, RHODE ISLAND
PROGRESS NOTES

C...410-0108 04/21/00 023
CONNELLY, DOROTHY
... GATES ST
... UCKET
08/29/62 FCA
0371 WEIR, RI 028..

| DATE/TIME | |
|---|---|
| 4/7/00 | Acute: Wants to go to ER for meds cant sleep victim of Domestic Violence very depress wgt 139 BP 128/74 P 80 T 98.7 |
| | [signature] |
| 4-20-00 | Behavioral Science |
| | Spoke c̄ Dan Troyer MSW concerning Ms. Connelly's visit to the ER. She was apparently quite resistent to counseling and asking only for medication. Mr. Troyer referred her back to her PCP. |
| | M Smith PhD |

05/29/62 037Y 04103041[illegible]
CONNELLY, DOROTHY [illegible]
PAWTUCKET [illegible]

ROS: Multiple complaints including (L) shoulder pain, anxiety

PE: T = 99 HR = 117 BP = 120/86

Gen: WD/WN W ♀ in NAD

HEENT: Anicteric

Chest: Clear, ⊖ (R) axillary adenopathy or tenderness




(R) breast is tender & can not be assessed for masses

Cor: Reg

Abd: soft

(mcv = 101)

Data: 9.8 > 14.7 / 43.6 < 205      137 | 99 | 8 / 4.4 | 28 | 0.9 < 100

(L) shoulder films: Pending

(A/P) (R) breast abscess
- IV Ancef given in ED
- To OR for I & D urgently
- Probably will need admission for IV Abx
- Needs 1° care arranged to address her multiple complaints not related to breast abscess including (L) shoulder pain, anxiety, and issues associated $\bar{c}$ prior Hx of abuse.
- ↑ mcv is suggestive of significant EtOH consumption, although pt states she is a "social drinker"

Doctor's Notes